# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 23-0406V

|  |  |
|---|---|
| BARBARA GLOVER,<br><br>              Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br><br>Filed: June 23, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Madylan Louise Yarc, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On March 23, 2023, Barbara Glover filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from Guillain-Barré syndrome ("GBS"), causally related to an influenza ("flu") vaccine she received on November 23, 2020. Petition at 1. The case was assigned to the Office of Special Masters' Special Processing Unit (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

After Respondent conceded entitlement in January 2024, the parties were unable to agree on the sole damages component of actual (past) pain and suffering, and the parties briefed the issue. Brief filed Sept. 26, 2024, ECF No. 29 (seeking $200,000.00 for a "severe and long-lasting bout of GBS" and a "non-contributory past medical history"); Response filed Oct. 28, 2024, ECF No. 30 (proposing $100,000.00 on the grounds that Petitioner's GBS was more limited, and her residual symptoms may be attributable to preexisting restless legs syndrome ("RLS")); Reply filed Nov. 27, 2024, ECF No. 31). **For the reasons set forth below, I find that Petitioner is entitled to a past/actual pain and suffering award of $145,000.00.**

## I.    Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I – II of *Ashcraft v. Sec'y of Health & Hum. Servs.*, No. 23-1885V, 2025 WL 882752, at *1 – 4 (Fed. Cl. Spec. Mstr. Feb. 27, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The parties agree, and my own review of the evidence confirms, that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The record shows that upon receiving the at-issue flu vaccine on November 23, 2020, Petitioner was 76 years old and retired. Her preexisting diagnoses included restless legs syndrome ("RLS")[4] and heart disease. *See, e.g.*, Ex. 2 at 86, 181, 223, 249, 271.

Petitioner's initial GBS course was moderate to mild. Eleven (11) days post-vaccination, on December 4, 2020, she awoke with tingling, numbness and weakness in her legs; she called paramedics, who ruled out a stroke. Ex. 2 at 89. She saw her primary care provider ("PCP") later that day, *id.* at 90, and was then admitted for a seven-day inpatient hospitalization (from December 4 – 11, 2020), during which she was promptly diagnosed with and treated for GBS. She underwent a chest x-ray, EKG, bloodwork, head and brain CT scans, head and cervical spine MRIs, intravenous administration of lorazepam (Ativan), five days of IVIg, and inpatient physical therapy ("PT") and occupational therapy ("OT"). *See, e.g.*, Ex. 6 at 81 – 88, 96 – 97, 135 – 44.[5]

During the hospitalization, Petitioner reported pain in her neck, shoulders, and arms which was not relieved by Tylenol or a muscle relaxant, prompting prescriptions for oxycodone and gabapentin (Neurontin). Ex. 6 at 123 – 24, 141, 157, 355. She developed "mild" right-sided facial swelling, numbness, and drooping which was assessed as Bell's palsy and treated with local eye care, oral steroids, and (precautionary) antiviral therapy.[6] *Id.* at 164. A hospital neurologist attributed Petitioner's facial symptoms to her diagnosed GBS, and expected both to improve over time. *Id.* at 191. On December 9th, EMG/NCV

---

[4] The Response at 13 cited a Mayo Clinic webpage, which provides that RLS (also known as Willis-Ekbom disease) is characterized by "compelling, unpleasant" sensations described as "crawling, creeping, puling, throbbing, aching, itching, [or] electric." The sensations typically manifest bilaterally, in the legs – but also sometimes affect the arms. The sensations cause a compulsion to move the affected extremities. RLS can disrupt sleep, which interferes with daily activities. The condition's etiology is not fully understood, but it is more common with increasing age; more common in women than in men; and sometimes occurs with other conditions including peripheral neuropathies and iron deficiency. *Restless Legs Syndrome*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/restless-legs-syndrome/symptoms-causes/syc-20377168 (last accessed June 20, 2025).

It is also noted that Petitioner's *post-vaccination* records also suggest of history of fibromyalgia, which was not found in the pre-vaccination records. It is unclear whether Petitioner and/or the medical providers were conflating RLS with fibromyalgia.

[5] Petitioner did not undergo a lumbar puncture because it would have required stopping her anticoagulant medication. Ex. 6 at 107 – 08.

[6] Bell's Palsy has been linked to various viruses including herpes zoster. *Bell's Palsy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bells-palsy/symptoms-causes/syc-20370028 (last accessed June 20, 2025).

studies indicated a sensorimotor demyelinating peripheral neuropathy consistent with early GBS. Ex. 5 at 14. December 9th also marked the last inpatient neurology follow-up, which indicates Petitioner's "marked improvement" upon completing IVIg treatment and "no need for further treatment" beyond rehabilitative therapies. *Id.* at 193. Petitioner complained of ongoing diffuse pain, but she declined a higher dose of gabapentin (300mg, rather than just 100mg) at night due to apparent hallucinations "in the past." *Id.* at 188, 191.[7]

That same day, an internal medicine doctor newly prescribed duloxetine (Cymbalta)[8] "to help with neuropathic pain as well as fibromyalgia."[9] Ex. 6 at 189. By the last inpatient PT session on December 11, 2020, Petitioner was progressing towards her goals, but still required a rolling walker and a family member standing by. *Id.* at 226 – 28. That same day, she was discharged with a final diagnosis of GBS. *Id.* at 98. Petitioner declined referral to inpatient rehabilitation due to concerns about COVID-19 exposure (specifically because she would have had to share a bedroom) and she had "improved enough that she preferred to return home with home health services." *Id.* at 98, 148, 225.

Petitioner's post-hospitalization GBS course was also somewhat mild. In mid-December 2020, she was confirmed to be weak and reliant on a rolling walker – but also deemed safe and independent within her single-family home. She did not receive any formal outpatient PT or OT, only home exercises. Ex. 2 at 84 – 87, Ex. 3 at 24, 34, 51. But over the next three months, she received 17 home health sessions focused on improving ambulation, identifying fall risks, and managing her anticoagulant medication. Ex. 3 at 189.

---

[7] The December 2020 hospitalization records do not contemporaneously document any hallucinations.

[8] The Response at n. 1 cited a Mayo Clinic webpage which provides that duloxetine (Cymbalta) is an antidepressant; however it is also prescribed for patients with pain caused by nerve damage, muscle pain, and joint stiffness. *See Duloxetine*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last accessed June 20, 2025).

The Response at n. 1 also suggests that Petitioner "had been *previously* prescribed [duloxetine (Cymbalta)] for her restless legs syndrome," (citing Ex. 2 at 86) (emphasis added). But the cited December 15, 2020 primary care record only provides that Petitioner would "continue" taking the medication, and the record could be reasonably understood to just continue the treatment initiated in during the previous week's hospitalization.

[9] As noted *infra* at n. 4, the pre-vaccination records do not confirm a diagnosis of fibromyalgia, only RLS.

By a January 12, 2021 PCP follow-up, Petitioner no longer needed assistive devices to walk; she felt a lot better, but still tired easily. Ex. 2 at 78. The PCP recorded that Petitioner "fe[lt] 'blessed' that she ha[d] no residuals," and "her Bell's palsy ha[d] resolved as well." *Id.* A Cymbalta dose reduction was planned. *Id.*

At a February 2021 outpatient neurology initial evaluation, Petitioner reported that she had discontinued Cymbalta because of cognitive and sleep disturbances, and then developed new neuropathic pain and numbness in her hands, which the neurologist attributed to GBS. Ex. 5 at 54, 62. "She [Petitioner] also note[d] subjective worsening of her RLS, and her husband adds that her nocturnal limb movements, consistent with PLMS,[10] are significantly increased as well." *Id.* at 54. The neurologist assessed Petitioner's RLS as "severe." *Id.* at 61.

On March 3, 2021, Petitioner underwent a repeat EMG of the left arm and leg, with findings interpreted as "abnormal, with electrophysiologic evidence of a sensory and motor peripheral neuropathy with some demyelinating features." Ex. 5 at 24. The EMG findings were "compatible with [Petitioner's] prior [GBS] that worsened after the December 9, 2020 study, and then subsequently improved." *Id.*; *see also* Ex. 2 at 63 (March 10th PCP appointment yielding prescription for a different nerve pain medication – pregabalin (Lyrica)); Ex. 3 at 182, 187 – 89 (April 9th home health care discharge, with all goals met).

On April 8, 2021, the neurologist assessed that Petitioner had ongoing painful paresthesias and skin sensitivity for which she would titrate Lyrica and try a ketamine compounding cream. Ex. 5 at 51. Petitioner also had "mild residual balance difficulties consistent with sensory ataxia," posing a fall risk. *Id.* The neurologist felts that she was "moving in the right direction" in her recovery from GBS, and future follow-ups would be with a physician's assistant ("PA"). *Id.*

On July 20, 2021, a neurology PA recorded that Petitioner had ongoing paresthesias not managed with Lyrica (which had caused hallucinations) or ketamine cream (which had caused tachycardia). Ex. 5 at 37. Petitioner also reported being "very restless at night and does not sleep well," due to RLS. *Id.* at 37, 40. Petitioner was offered Carbatrol and Trileptal for the painful paresthesias, but declined (noting her inability to tolerate five previous pain medications). *Id.* at 42. She was prescribed Clonazepam for

---

[10] Another Mayo Clinic webpage (not cited by Respondent, located independently by the Court) explains that about 80% to 90% of people who have RLS also experience their legs twitching or kicking when they're asleep. This is called periodic limb movements of sleep ("PLMS"). *Restless Legs Syndrome*, Mayo Clinic, https://mcpress.mayoclinic.org/living-well/restless-legs-syndrome/ (last accessed June 20, 2025).

her RLS. *Id.* She would also defer vaccinations until 12 months post-GBS (e.g., for about four more months). *Id.*

October 19, 2021 marked Petitioner's last neurology appointment. A nurse and a PA separately recorded Petitioner's report that her paresthesias (numbness, tingling, and pain) were gone. Ex. 5 at 33, 30. Petitioner also reiterated her complaints of restlessness, poor sleeping, and fatigue; the nurse suggested that "fatigue could be associated with GBS." *Id.* at 33. But the PA seemed to disagree - adding a new diagnosis of insomnia, noting that the previously prescribed Clonazepam had not been effective in managing Petitioner's sleep and restlessness, offering a new prescription for Trazodone, and suggesting an endocrinology consult. *Id.* at 35. The physical examination was only positive for mild sensory ataxia and decreased deep tendon reflexes in the right arm. *Id., see also* Ex. 6 at 5 – 47 (cardiology encounters briefly mentioning history of GBS).

The last primary care medical record is from January 2022. Petitioner endorsed weakness, dizziness, and gait unsteadiness – but there are no GBS-related exam findings, assessment, or treatment plan. Ex. 2 at 12 – 15. But in an April 10, 2024 "to whom it may concern" letter, the PCP recounts Petitioner's GBS initial course and states: "She continues to have weakness in her legs, after 3 years, which will most likely be lifelong. Symptoms could remain the same or could possibly worsen… She is having difficulty sleeping related to her sxs [symptoms]." Ex. 8 at 2. The PCP's letter does not ,confirm the last time she actually evaluated Petitioner, or address her preexisting RLS. Petitioner does not address these questions either, in her two affidavits attributing ongoing leg pain, stiffness, and fatigue to her GBS. Exs. 7, 9. Accordingly, those later statements are much less persuasive than the medical records.

Overall, I agree with Respondent that the medical records depict Ms. Glover as achieving a substantial recovery from her GBS within approximately eleven months – around the time of her last neurology evaluation. At this time she was documented to be experiencing only mild sensory ataxia, and decreased deep tendon reflexes in the right arm, which are most likely attributable to GBS. But such residual symptoms are seen in *many* GBS cases, and Ms. Glover was able to manage them herself (as the evidence does not document any significant falls, and she did not seek any further skilled therapies).

Moreover at her last neurology evaluation Ms. Glover reported that her (presumably GBS-related) paresthesia had disappeared. Those symptoms were not documented for several years thereafter, and to the extent that they were still present or recurred, they could be part of her preexisting RLS. No medical provider (or Petitioner's briefing) has suggested that Ms. Glover's GBS caused a worsening of her RLS, and I

have previously distinguished between the two conditions in another GBS pain and suffering determination. *Taylor v. Sec'y of Health & Hum. Servs.*, No. 18-100V, 2021 WL 1346059, at *5 (Fed. Cl. Spec. Mstr. Mar. 12, 2021) (concluding that a petitioner's purported GBS residual effects were instead attributable to RLS); *see also* Mayo Clinic webpage cited infra n. 4 (providing that RLS symptoms "common[ly]… get better and worse," but "ten[d] to get worse with age").

For those reasons, Petitioner has not substantiated her request for $200,000.00 – or even the $180,000.00 awarded in her cited cases.[11] She has not described a uniquely-traumatic initial course[12] or extensive rehabilitation.[13] Her active treatment course spanned less than one year. She has not shown disruptions in employment or physically demanding pursuits,[14] beyond typical activities of daily living and time spent with loved ones, and the fact of her preexisting RLS likely explains some of her ongoing symptoms in her legs and resulting fatigue. *See also* Response at 13 – 19 (generally arguing that Petitioner's GBS was comparatively less severe).

At the same time, Respondent has not adequately defended his valuation of $100,000.00 - which would be appropriate only for the mildest instances of GBS. *See Ashcraft*, 2025 WL 882752, at *3. He cited only *one* reasoned opinion, *Granville* (awarding $92,500.00).[15] But compared to the *Granville* petitioner, Ms. Glover was hospitalized for two additional days; she relied on a rolling walker for a month; she had eleven more

---

[11] *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL1915138 (Fed. Cl. Spec. Mstr. March 26, 2020); *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Kresl v. Sec'y of Health & Hum. Servs.*, No. 22-0518V, 2024 WL 1931498 (Fed. Cl. Spec. Mstr. Apr. 1, 2024).

[12] *Compare, e.g.*, *Fedewa*, 2020 WL1915138, at *5 (noting that the petitioner sought medical attention three times before his hospital admission, and then reported difficulty with his diagnostic testing and IVIg treatment); *Kresl*, 2024 WL 1931498, at *2 (transfer to the intensive care unit due to worsening weakness and "encephalopathic" mental status changes).

[13] *Johnson*, 2018 WL 5024012, at *7 – 8 (in-home and outpatient physical therapies, followed by 45 personal trainer sessions); *Fedewa*, 2020 WL1915138, at *5 (11 inpatient and 22 outpatient rehabilitation stays); *Kresl*, 2024 WL 1931498, at *3 (35-day inpatient rehabilitation for a "quadriplegic-like picture," followed by nearly 50 outpatient therapy sessions).

[14] *Johnson*, 2018 WL 5024012, at *7 (inability to work as a school bus driver and school librarian); *Fedewa*, 2020 WL1915138, at *6 (return to work after three months with financial pressures and lifting restrictions, as well as reduced farming, biking, swimming, and service projects); *McCray,* 2021 WL 4618549, at *4 (inability to resume part-time employment); *Kresl*, 2024 WL 1931498, at *4 (very active lifestyle and part-time employment prior to GBS).

[15] *Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 64413388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

outpatient therapy sessions; she attempted various pain medications over roughly six months; her GBS recovery was supervised by a neurology specialists for several more months; and she presented better evidence of GBS residuals (specifically decreased reflexes in one arm, and ataxia) compared to the *Granville* petitioner who conceded the fact of her full recovery, *Granville*, 2023 WL 64413388, at \*3.

I find that Ms. Glover's GBS pain and suffering was more similar to that of the claimant from the recent *Paveglio* case (awarding $145,000.00), which also featured a retiree who endured a relatively straightforward and short hospital course, one round of IVIg with improvement, and no inpatient rehabilitation. That claimant did not have prominent neuropathic pain, but he completed more outpatient therapy and was monitored by a neurologist longer.[16] The cases are therefore roughly equivalent, making that pain and suffering award a good comparable for this case.

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $145,000.00 represents a fair and appropriate amount of compensation for this Petitioner's actual pain and suffering.[17]**

### Conclusion

**I therefore award Petitioner a lump sum payment of $145,000.00 (for actual pain and suffering), to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[16] *Paveglio v. Sec'y of Health & Hum. Servs.*, No. 23-0739V, 2025 WL 1326313 (Fed. Cl. Spec. Mstr. Apr. 3, 2025)/

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at \*1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.